# Illinois Official Reports

## Appellate Court

## *People v. Horman*, 2018 IL App (3d) 160423

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM B. HORMAN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0423 |
| Filed<br>Rehearing denied | December 19, 2018<br>January 17, 2019 |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 15-CF-149; the Hon. H. Chris Ryan Jr., Judge, presiding. |
| Judgment | Affirmed and remanded. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Dimitri Golfis, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Karen Donnelly, State's Attorney, of Ottawa (Patrick Delfino, David J. Robinson, and Stephanie Raymond, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion.<br>Justices Schmidt and Wright concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant, William B. Horman, appeals his convictions for first degree murder and concealment of a homicidal death, arguing (1) that defense counsel was ineffective for failing to file a motion for reconsideration of its pretrial order granting the State a continuance and a motion to dismiss on speedy trial grounds and (2) that the circuit court should have conducted a preliminary *Krankel* inquiry into defendant's *pro se* posttrial allegations of ineffective assistance of counsel. We affirm and remand.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) and concealment of a homicidal death (*id.* § 9-3.4(a)). On August 10, 2015, the State moved for a continuance for a trial date outside of the 120-day statutory speedy trial period in order to perform DNA testing. The State had previously moved for a continuance within the speedy trial window. The written motion was substantial in length and alleged that the crime scene processing took an extended period of time, since the evidence needed to be recovered from both the burn pile where the bones had been burned and the Fox River where the burned bones had been dumped. The bone fragments found then had to be identified as human bones before they could be sent to the laboratory. The motion further alleged that Illinois State Police forensic scientist Kelly Krajnik found the bone fragments to be in very poor condition. Due to their condition, she was not able to clean the bones as she normally would. One bone fragment was insufficient for DNA testing, and another had only resulted in a partial profile that did not match the deceased. She believed there was "some likelihood" that the partial DNA profile was due to a contaminant. Krajnik had recommended "that special mitochondrial DNA testing be performed on the bones in order to insure an accurate and verifiable DNA result." Krajnik's affidavit further stated that "in [her] opinion there may be a contaminant involved." She further averred, "I believe that mitochondrial DNA testing is necessary in order to get a complete analysis of the DNA in this case." The Illinois State Police did not have the capability of providing such testing. The State contacted the three laboratories that were equipped to perform the testing. None of them could perform the testing within the statutory speedy trial deadline, but the State chose the laboratory that could perform the testing in the most expedited time frame. The motion further stated, "This testing may establish that the bones are from the person of Robert Dowd." Defense counsel objected to the motion, arguing that the motion was lacking and that defendant wanted his trial to begin as soon as possible. The court granted the motion, and set the trial for September 28, 2015, outside the 120-day speedy trial time frame.

¶ 4      On September 25, defendant waived his speedy trial right and moved for a continuance, stating, "We have just received some new information regarding the co-defendant, as well as we're still awaiting the results from our expert on our DNA tests." The trial was then set for November 16. Defendant twice again moved for a continuance because their expert asked for additional time. The trial was not held until February 29, 2016.

¶ 5      Defendant worked for Dowd at Rob's Washouts (Washouts) in Ottawa. Many witnesses testified that defendant was angry at Dowd for not making him a partner in his business and that defendant had stated he wanted to hurt or kill Dowd. On April 15, 2015, one of Dowd's friends had gone to Dowd's property and saw a smoldering fire in a burn pile, but could not find Dowd. The sheriff's office did a well-being check, but could not locate him. Another

friend went to his house later that evening, saw a small fire burning, and saw Dowd's Ford Bronco, but did not see Dowd. The friend returned the following morning and saw defendant and Jonathan Beckman cleaning up. The fire had been raked up. Defendant said he had not seen Dowd. Another friend saw Dowd's Bronco at Washouts and started yelling for Dowd. Defendant was at Washouts and told the friend that Dowd left to do his taxes, meet some guys, and then go to Missouri. Defendant appeared nervous, and there were six garbage bags by the door.

¶ 6        Jonathan Beckman testified that on April 14 after 9 p.m., defendant called to tell him that he was upset with Dowd. Defendant then told Beckman that he was coming to pick him up. When defendant picked up Beckman, defendant said he was going to kill Dowd that night. They went to Washouts around 9:30 p.m. Beckman entered Washouts and saw Dowd asleep on a cot. He then told defendant that Dowd was asleep. Defendant grabbed a homemade wooden club from his truck. Defendant told Beckman that he had a bad arm and asked Beckman to "go in there and do it." Beckman refused, saying he did not have any problems with Dowd. Defendant then told Beckman to open the sliding glass door to the office so he could enter. Beckman opened the door and defendant entered Dowd's office. Beckman heard 10 to 15 thuds. He did not look into the office. Defendant then yelled to Beckman to grab a tarp and lay it on the floor. Defendant grabbed Dowd's legs and dragged him onto the tarp. Defendant then hit Dowd three times in the back of the head with the wooden club. Beckman saw "blood coming out from behind [Dowd's] ear." Beckman helped pull the tarp over Dowd, but defendant loaded the body into defendant's truck by himself. They drove to Dowd's trailer, and defendant dragged Dowd's body onto a burn pile, poured oil onto it, and lit it on fire. Defendant then placed wooden pallets and the wooden club on top of the burning body. Around 3 a.m., defendant found a bucket and lined it with aluminum foil. He then used a wooden spoon to crush the burned bone fragments and scoop them into the bucket. The Fox River was approximately 30 to 40 yards away from the burn pile. They walked to the river with the bucket, and Beckman acted as a lookout while defendant threw the remains into the river. They repeated this about five times. They went to another part of the river and dumped the bucket approximately 15 times. They then returned to clean up Washouts, and Beckman drove Dowd's Bronco back to his trailer. They later left Dowd's Bronco with someone in the Harvey area. Beckman had a deal with the State wherein he would plead guilty to concealment of a homicidal death and receive five years in the Department of Corrections in exchange for testifying against defendant.

¶ 7        Defendant was interviewed twice by investigators. The first time he was interviewed, he was not a suspect, and he did not make any incriminating statements. The second time he admitted being with Beckman at Washouts at the time of Dowd's death. He said that Dowd hit his head and quit moving. He and Beckman put Dowd's body in a tarp, burned it, and then threw the remains in the river. They abandoned Dowd's Bronco in the vicinity of Morris.

¶ 8        Two individuals testified that defendant and another man came to their home in Harvey with the Bronco. Defendant told one of them they were better off not knowing why defendant did not have the title to it. The next day, one of the individuals drove the Bronco to "a place that does business with cars." Several days later, officers from the La Salle County Sheriff's Department came to speak with him, and he took them to the location of the Bronco.

¶ 9        Blood was recovered at Washouts, and it was determined to be Dowd's. Bone fragments were discovered in the burn pile and the Fox River, but they were severely burned and very

fragmented. An expert determined that the fragments came from the same adult individual. Krajnik said she had never seen bones so badly damaged. She was not able to clean the bones. She was skeptical that she could obtain any DNA from the bones. She obtained no DNA from the bones collected from the burn pile. She obtained a small amount of DNA from a fragment collected from the river, but the profile obtained did not match Dowd, defendant, or Beckman. She thought the result might have been from a contaminant. Krajnik recommended the mitochondrial DNA testing, stating: "I wanted to find out if the results that I had could be confirmed by mitochondrial testing. And what I mean by confirmed is I wanted to know if they type the same bone samples I typed, will they get a result." She further stated,

> "I was skeptical that I would get anything to begin with just because of their condition. And because I did get a result and because it wasn't what I expected to get, I was fairly certain it had to have been a contaminant along the way. I just didn't know where it would be from."

The mitochondrial DNA expert was not able to obtain any DNA results.

¶ 10    Defendant did not present any evidence. After both parties rested, defendant stated to the court:

> "I've been misinformed before, during my trial that I would be found guilty at trial. I had asked my lawyers to question witnesses and evidence at cross-examination and [received] no response. I don't believe I got a fair misrepresentation [*sic*] because they had ill intentions from the get-go to send me to prison for something I didn't do. I've asked them repeatedly to question witnesses on and off the stand to show my innocence. *** [T]he witnesses were Mike Diaz, Bob—Barbie Fuller, Rob Douglas Murray and Donnie Thompson."

The public defender stated:

> "First of all, as far as the witnesses go, we've interviewed those people. Most of them. I think one's a new name that he never told us before. They're absolutely of no help to us whatsoever. In fact, some of them would have been extremely helpful to the State.
>
>    As far as being misinformed, on Monday I went down and told him exactly what every witness was going to say and what I thought the effect would be upon the case. Explained it to him thoroughly."

Based on what was presented, the court said it could not "find anything which shows an incompetency or a lack of presentation or preparation in the matter." Defendant then said he wanted to testify, so the court reopened the proofs. Defendant stated that he had nothing to do with Dowd's disappearance. He said he did not hit or hurt Dowd. He had lied to the investigators to tell them what they wanted to hear. He was "stoned, intoxicated, and possibly drugged" during the interview, which he did not remember. The jury found defendant guilty.

¶ 11    Prior to sentencing, defendant sent four letters to the circuit court. The first letter stated there was "ineffective assistance" where his counsel (1) labored under an actual conflict of interest, (2) failed to present expert testimony, (3) did not check for fingerprints, and (4) did not test his hair or nails for drugs. The second letter asked for a new trial because defense counsel (1) failed to present expert testimony concerning footprints, hair, and DNA evidence; (2) never asked "critical and crucial" questions of the expert witnesses; (3) never asked about a note left by "Grumpee"; and (4) did not impeach witnesses. The third letter said defense counsel should have questioned more people, tested for prints, and checked his medical history

to see that he was limited on the amount of weight he could carry. The fourth letter stated that counsel violated his sixth amendment right by failing to obtain witnesses in his favor.

¶ 12    At the sentencing hearing, the court told defendant it had read his letters. However, the court did not discuss or inquire about the allegations contained therein. Defendant was sentenced to 35 years' imprisonment for first degree murder and 5 years' imprisonment for concealment of a homicidal death. Defendant sent a fifth letter to the court after sentencing, again stating that his "VI amendment was violated-[his] right to counsel" for failure to obtain witnesses. He said counsel was incompetent and did not explain things to him. The record does not show that the contentions in the letter were ever discussed.

¶ 13                                      II. ANALYSIS

¶ 14    On appeal, defendant contends that (1) defense counsel was ineffective for failing to move the circuit court for reconsideration of its pretrial order granting the State a continuance beyond the 120-day speedy trial period to obtain additional DNA testing and failing to file a motion to dismiss on speedy trial grounds and (2) the court erred in failing to hold a preliminary *Krankel* inquiry into the ineffective assistance claims raised in the letters he sent the court. First, we find that defendant has failed to show that defense counsel's performance was deficient or that he was prejudiced by the failure to move for reconsideration and dismissal, as Krajnik's trial testimony was similar to her affidavit and the mitochondrial DNA testing was material. Second, we find that the court should have held a preliminary *Krankel* hearing to address defendant's contentions of ineffective assistance of counsel.

¶ 15                              A. Ineffective Assistance

¶ 16    Defendant first contends that counsel was ineffective for failing to move to dismiss the case on statutory speedy trial grounds. "In Illinois, a defendant has *** a statutory right to a speedy trial." *People v. Cordell*, 223 Ill. 2d 380, 385 (2006). This right is contained in section 103-5(a) of the Code of Criminal Procedure of 1963 (Code), which states, "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***." 725 ILCS 5/103-5(a) (West 2014). However, section 103-5(c) of the Code states, in pertinent part, "If the court determines that the State has exercised without success due diligence to obtain" the "results of DNA testing that is material to the case and that there are reasonable grounds to believe that such results may be obtained at a later day, the court may continue the cause on application of the State for not more than an additional 120 days." *Id.* § 103-5(c). Stated another way, in order for the State to receive a continuance outside of the statutory 120-day speedy trial guarantee for DNA testing, the State has to show that (1) it exercised due diligence to obtain DNA results, (2) the DNA results are material to the case, and (3) the results can be obtained at a later date. *Id.*

¶ 17    Defendant does not challenge that the State exercised due diligence in obtaining the mitochondrial DNA results or that the results could be obtained at a later date. Instead, defendant contends that Krajnik's testimony at trial called into question the materiality of the mitochondrial DNA results and, therefore, defense counsel was ineffective for failing to move to reconsider the continuance and to dismiss the case. Defendant contends that Krajnik's testimony at trial "painted an entirely different picture" than the State's motion for continuance and Krajnik's affidavit attached to such motion. Defendant states:

"Krajnik's trial testimony revealed that the trial court continued [defendant's] trial beyond the 120-day speedy-trial period on the basis of misinformation and material omissions in the State's motion to continue and Krajnik's supporting affidavit. The motion and affidavit mischaracterized the nature of Krajnik's test results and the reason why she recommended mitochondrial DNA testing. The motion also presented a false impression that further DNA testing could establish that the bones were from Dowd— something that Krajnik never corroborated and that her trial testimony refuted."

Defendant points to the fact that the State's motion said there was "some likelihood" that the partial DNA result was from a contaminant, while Krajnik's testimony stated she was "fairly certain" it was a contaminant. Defendant states that Krajnik "merely wanted mitochondrial DNA testing to confirm her result" and "a second round of DNA testing, albeit more sensitive testing, yielding either a DNA profile not consistent with the victim, [defendant], or Beckman *** or no DNA profile at all *** would not have been material to the case."

¶ 18      Our supreme court has stated:

"To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant. [*People v.*] *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland* [*v. Washington*], 466 U.S. at 687). Specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *People v. Simpson*, 2015 IL 116512, ¶ 35 (quoting *Strickland*, 466 U.S. at 694). A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness. *Simpson*, 2015 IL 116512, ¶ 35 (citing *People v. Patterson*, 192 Ill. 2d 93, 107 (2000))." (Internal quotation marks omitted.) *People v. Veach*, 2017 IL 120649, ¶ 30.

¶ 19      We find that counsel's failure to move for reconsideration or dismissal did not amount to deficient performance. The differences in Krajnik's affidavit and trial testimony were minimal at most. Krajnik was not an expert in mitochondrial DNA testing and could not perform it. She specifically stated that it was a more sensitive test and she "wanted to know if they type the same bone samples [she] types, will they get a result." The mitochondrial DNA test could have found (1) no DNA (which it did), thus confirming that whatever she found was a contaminant, (2) some partial DNA that did not match Dowd, thus determining that the bones were not from Dowd, or (3) some DNA of Dowd. Any of these results would have been material to the case. Though Krajnik did not testify or aver in her affidavit that the DNA of Dowd could be found, it was still a potential option with the more sensitive testing. Moreover, a finding of no DNA or a determination that the bones were not from Dowd would have been favorable to defendant. Therefore, defendant cannot establish that counsel was unreasonable for failing to move the circuit court for reconsideration of the continuance or a dismissal on speedy trial grounds.

¶ 20      Further, defendant has also not shown that he was prejudiced by his counsel's alleged failure. The court was unlikely to have granted either the motion to reconsider or the motion to dismiss. Even with Krajnik's trial testimony, the mitochondrial DNA testing was material to the case. We also note that defendant subsequently waived his speedy trial right and moved

for a continuance multiple times, based on the fact that the State was still awaiting results from its DNA expert.

¶ 21                                   B. Preliminary *Krankel* Inquiry

¶ 22     Next, defendant contends that the court should have conducted a preliminary *Krankel* inquiry into the allegations of ineffective assistance of counsel contained in the letters that defendant sent the court prior to sentencing. We note that the court had previously conducted a preliminary *Krankel* inquiry for the ineffective assistance of counsel claim defendant raised at the close of evidence at trial.

¶ 23     At the outset, we note that the State contends that the circuit court read defendant's letters and "found, not only that defendant's claims were without merit, but that they had already been addressed during the previous *Krankel* hearing." The State mischaracterizes the record. The court stated at the sentencing hearing only that it had read defendant's letters. It did not make any findings regarding the merit of the claims or state that that claims had been previously addressed. The record contains no indication that the court actually considered the letters at all. Moreover, the preliminary *Krankel* inquiry held after the close of evidence did not address many of the ineffective assistance of counsel allegations that defendant subsequently raised in his letters.

¶ 24     A defendant who raises a *pro se* posttrial claim of ineffective assistance of counsel is entitled to have those claims heard by the circuit court. *People v. Krankel*, 102 Ill. 2d 181 (1984). Hearing those claims is a two-step process: (1) the circuit court makes a preliminary inquiry to examine the factual basis of the defendant's claim and (2) if the allegations show "possible neglect of the case," new counsel is appointed to represent the defendant in a full hearing on his *pro se* claims. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). In order to trigger a preliminary inquiry, " '[a] *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention' [citations], and thus, a defendant is not required to file a written motion [citation] but may raise the issue orally [citation] or through a letter or note to the court [citation]." *People v. Ayres*, 2017 IL 120071, ¶ 11 (quoting *Moore*, 207 Ill. 2d at 79). "In making the inquiry, 'some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim.' " *Id.* ¶ 12 (quoting *People v. Jolly*, 2014 IL 117142, ¶ 30, and citing *Moore*, 207 Ill. 2d at 78). The circuit court may address the contentions with counsel and the defendant and may "make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *Id.*

¶ 25     The parties do not dispute that the court held a preliminary *Krankel* inquiry after the close of evidence at trial. Defendant stated,

> "I've been misinformed before, during my trial that I would be found guilty at trial. I had asked my lawyers to question witnesses and evidence at cross-examination and [received] no response. I don't believe I got a fair misrepresentation [*sic*] because they had ill intentions from the get-go to send me to prison for something I didn't do. I've asked them repeatedly to question witnesses on and off the stand to show my innocence. *** [T]he witnesses were Mike Diaz, Bob—Barbie Fuller, Rob Douglas Murray and Donnie Thompson."

The court gave defense counsel an opportunity to respond, and then the court said it could not "find anything which shows an incompetency or a lack of presentation or preparation in the matter."

¶ 26 However, after trial, defendant sent multiple letters to the court raising various additional claims of ineffective assistance of counsel. Thus, the question before us is whether the court was required, under *Krankel* and its progeny, to conduct another preliminary *Krankel* inquiry to address the subsequent claims defendant raised. The State contends that a defendant is not entitled to multiple preliminary *Krankel* inquiries, asserting that it is "unaware of any authority stating that a defendant may bring an endless string of such claims prior to sentencing and have them all heard in successive *Krankel* proceedings." Likewise, defendant states that he "is unaware of any authority stating that a defendant may not do so." We too have failed to find any case law expressly discussing the matter and believe it is a question of first impression.

¶ 27 We believe that the public policy considerations discussed by our supreme court in *Ayres* appear to support the contention that a defendant could raise multiple ineffective assistance of counsel claims posttrial that require successive *Krankel* proceedings. *Ayres* says:

> "The goal of *Krankel* is to 'facilitate the trial court's full consideration of a defendant's *pro se* claims of ineffective assistance of trial counsel and thereby potentially limit issues on appeal.' *Jolly*, 2014 IL 117142, ¶ 29. Moreover, '[b]y initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create the necessary record for any claims raised on appeal.' *Id.* ¶ 38. Absent such a record, as in the case at bar, appellate review is precluded. Moreover, the inquiry is not burdensome upon the circuit court, and the facts and circumstances surrounding the claim will be much clearer in the minds of all involved when the inquiry is made just subsequent to trial or plea, as opposed to years later on appeal." *Id.* ¶ 21.

*Ayres* further states:

> "The purpose of the preliminary inquiry is to ascertain the underlying factual basis for the ineffective assistance claim and to afford a defendant an opportunity to explain and support his claim. In this way, the circuit court will have the necessary information to determine whether new counsel should be appointed to argue the claim of ineffective assistance of counsel. A defendant need only bring his claim to the court's attention, posttrial, whether orally or in writing." *Id.* ¶ 24.

¶ 28 The preliminary *Krankel* inquiry is a way for the court to efficiently consider a defendant's allegations of ineffective assistance of counsel close in time to when they occurred and create a record that could be used on appeal. Such an inquiry is not burdensome on the court as it does not take much time; the preliminary inquiry, here, after the close of evidence, is contained on only 2½ pages of the record. As *Ayres* states:

> " 'What if a *pro se* defendant is present in court and says "I received ineffective assistance of counsel"? Can the circuit court just ignore that comment?' The answer is clearly 'No,' and because a circuit court cannot ignore such a claim, it would be illogical to now hold a court may ignore a claim made in a *pro se* defendant's written posttrial motion." *Id.* ¶ 23.

¶ 29 We believe the above reasoning applies equally to multiple ineffective assistance claims. Had defendant orally pronounced each of his allegations in open court, the court could not have ignored them. The fact that he brought the claims in separate letters does not change this

duty. We note, too, that allowing only one preliminary *Krankel* inquiry would lead to absurd results. The preliminary inquiry in this case happened at the close of evidence, but before the trial was over and before sentencing. Allowing only one inquiry would prevent a defendant in a similar situation from raising any contentions with counsel's performance during closing arguments, sentencing, or posttrial motions.

¶ 30     Defendant's letter raised many claims of ineffective assistance of counsel. Some actually included the words "ineffective assistance" or "sixth amendment," while other allegations did not specifically say ineffective assistance, but challenged counsel's failures more specifically. Either way, the court should have conducted a preliminary inquiry. See *People v. Lobdell*, 2017 IL App (3d) 150074, ¶ 37 (holding that either the words "ineffective assistance" or the substance of a claim was enough to require a preliminary inquiry). Therefore, we find that the court was required to hold a preliminary *Krankel* inquiry to ascertain the factual basis of defendant's ineffective assistance of counsel claims contained in his letters. We note that in cases such as this, where a defendant has sent multiple letters after trial, a court need not conduct a separate inquiry immediately after receiving each letter. The court, in this case, could have addressed five of defendant's letters when defendant was in court for the sentencing hearing. This may have prevented defendant from sending another letter after sentencing (the fifth of the five letters).

¶ 31     Here, the court never determined whether or not defendant raised a "colorable claim" of ineffective assistance of counsel. While the State would have us believe that it is defendant's duty to raise a "colorable claim" of ineffective assistance, we note that our supreme court has expressly held that a defendant's claim of ineffective assistance of counsel does not have to be legally sound in order to trigger a preliminary hearing. *Ayres*, 2017 IL 120071, ¶¶ 11, 35. The point of the preliminary inquiry is for the circuit court to give defendant an opportunity to flesh out his claim. *Id.* ¶ 20. It is only after the preliminary inquiry that the court determines whether defendant's allegations show possible neglect in order to require appointment of new counsel for a full *Krankel* hearing. *Moore*, 207 Ill. 2d at 77-78. We emphasize that a full interchange between the court, defendant, and counsel is not required in every preliminary inquiry. In some instances, the court's knowledge of counsel's performance and the insufficiency of the defendant's allegations may be enough to determine that defendant did not raise a colorable claim to justify a *Krankel* hearing. See *Ayres*, 2017 IL 120071, ¶ 12 (in making the preliminary inquiry, "the trial court is permitted to make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations"). Remand is warranted in the instant case because the court failed to conduct *any* type of preliminary inquiry. *Id.* ¶ 26.

¶ 32                                        III. CONCLUSION
¶ 33     The judgment of the circuit court of La Salle County is affirmed and remanded with instructions to conduct a preliminary *Krankel* inquiry.

¶ 34     Affirmed and remanded.