2020 IL App (1st) 17-0660-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
May 12, 2020

No. 1-17-0660

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois, |
| | ) | Criminal Division. |
| v. | ) | |
| | ) | No. 15 CR 16106 |
| DERRICK CLAY, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Neera Lall Walsh, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not use a double enhancement when sentencing the defendant to 10 years' imprisonment on his Class X armed habitual criminal conviction.  Furthermore, the trial court conducted an adequate preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) and properly determined that all of the defendant's allegations of ineffective assistance of counsel pertained to matters of trial strategy, so as not to require appointment of new counsel.

¶ 2    Following a bench trial in the circuit court of Cook county, the defendant, Derrick Clay, was found guilty of being an armed habitual criminal (AHC) and sentenced to 10 years' imprisonment.  On appeal, the defendant contends that in imposing his sentence, the trial court

erred by considering as aggravating factors the same prior convictions that had already served as the qualifying felonies for finding him guilty at trial. In addition, the defendant argues that we should remand his case for a new preliminary *Krankel* inquiry where the trial court failed to address all of his posttrial claims of ineffective assistance of his trial counsel. For the following reasons, we affirm.

¶ 3                                              I. BACKGROUND

¶ 4        In October 2016, the defendant was charged with one count of AHC (720 ILCS 5/24-1.7(a) (West 2016)), and two counts of unlawful use of a weapon by a felon (UUWF) (720 ILCS 5/24-16 (West 2016)). The State proceeded only on the AHC count. After the defendant waived his right to a jury, he proceeded to a bench trial at which the following relevant evidence was adduced.

¶ 5                                              A. Bench Trial

¶ 6        Chicago Police Officer Dan O'Brien testified that at about 6:40 p.m., on September 17, 2015, he executed a search warrant at 6923 South Jeffrey Boulevard, apartment G-S, with his two partners Officers Gutkowski and Czarnik. He testified that the officers had to break down the front door to enter the residence. Upon entering, the officers encountered the defendant, whom Officer O'Brien identified in court, along with an adult woman and several smaller children. The officers detained the defendant and conducted a systematic search of the apartment.

¶ 7        According to Officer O'Brien, the apartment was small and included a kitchen, a living room, a bathroom and two bedrooms: (1) a front west-facing bedroom with bunk beds for children, and (2) a rear, east-facing bedroom for adults. When the officers entered the apartment, the inhabitants were all in the living room. The defendant was about 15 to 20 feet away from the officers, near the doorway of the rear east-facing bedroom, which was unlocked. Officer

O'Brien testified that while searching that rear bedroom, he saw his partner recover a nine-millimeter handgun from the top shelf of an open closet. The gun, which was loaded with seven live rounds, was wrapped in a white t-shirt, and was not in a lockbox or any secure storage unit.

¶ 8    While in the rear bedroom, Officer O'Brien further observed the recovery of a letter addressed to the defendant from the windowsill, about 5 to 7 feet away from where the handgun had already been found. The letter was from the Illinois Department of Healthcare and Family Services and was addressed to the defendant at apartment G-S, 6923 South Jeffrey, the address where the warrant was executed.

¶ 9    According to Officer O'Brien after the defendant was placed under arrest, he was taken to Homan Square where he gave his name and date of birth as April 24, 1979.

¶ 10    On cross-examination, Officer O'Brien confirmed that when the officers conducted the search of the apartment, they found no other mail linking the defendant to the residence, or any photographs of the defendant with the adult female. In addition, the officer acknowledged that while male clothing was found in the rear bedroom, the size of that clothing was not recorded nor compared to the clothes that the defendant was wearing at the time of his arrest.

¶ 11    Officer Gutowksi[1]  next testified that he also partook in the search of the apartment on September 17, 2015. Officer Gutkowski stated that the defendant, whom he identified in court, was the only male adult in the residence when the officers executed the search warrant. Officer Gutkowski testified that together with Officer Czarnik, he detained the defendant and read him his *Miranda* rights. According to Officer Gutkowski the defendant waived his rights and agreed to speak with the officers. When they asked him about the recovered handgun, the defendant

---

[1] Officer Gutkowski's first name is not part of the record on appeal.

"stated that a dude [had] brought it over th[at] morning or earlier in the day, [that] it was wrapped in a white T-shirt, [and that the defendant] took it from [the dude] and the dude said he would come back later to pick it up." Officer Gutkowski averred that the defendant told the officers that the woman who lived in the apartment "didn't know [the handgun] was in there." The defendant was taken to Homan Square after this statement. Officer Gutkowski assisted in the defendant's processing, during which, the defendant provided his residence as the address at which the search warrant had been executed earlier that day. Officer Gutkowski agreed that this address was then marked on the defendant's arrest report.

¶ 12    On cross-examination, Officer Gutkowski admitted that the defendant's statement was not memorialized in any way, either in writing or by way of audio or video recording.

¶ 13    Upon the State's request, the trial court admitted into evidence the recovered letter, numerous photographs of the residence taken at the scene, and certified copies of the defendant's two prior convictions for: (1) aggravated vehicular hijacking under case number 01 CR 1333901, and (2) delivery of a controlled substance under case number 99 CR 1641901.

¶ 14    After the State rested, defense counsel moved for a directed finding arguing that there was a lack of evidence to establish the defendant's constructive possession of the loaded nine-millimeter handgun.  The trial court denied the motion, and the defendant proceeded with his own case-in-chief.

¶ 15    The defendant called Jasmine Robinson, the woman who lived with her children at the apartment where the search warrant was executed on September 17, 2015.  Robinson testified that the defendant was a family friend, who was visiting her on the day of the search. Robinson explained that, at that time, she had been on house arrest for child endangerment to which she had pleaded guilty, and that the defendant was helping her out by taking her children

4

to and from school. According to Robinson, the mother of the defendant's children was a neighbor and "lived down the street," and to Robinson's knowledge the defendant lived on 80th Street as well. On September 17, 2015, the defendant had come by Robinson's apartment to bring her children back from school. Robinson denied that the defendant lived with her or that he kept any belongings in her bedroom. Instead, she stated that the defendant had been in her apartment for only about two hours when the police arrived with the search warrant. Robinson averred that she was with the defendant the entire time he was in her apartment, and that he never entered her bedroom or handled any weapon.

¶ 16    Robinson further denied that there were any other male visitors to her apartment that day and stated that no one dropped off any items to the apartment. Instead, Robinson explained that the handgun that was recovered from the closet in her bedroom had belonged to her recently deceased husband, who had been in a nursing home prior to his death. Robinson explained that she had just received her deceased husband's belongings from the nursing home and was not aware of everything she had received. She did not know what to do with all the items, so she just stored everything in her closet.

¶ 17    Robinson next acknowledged that she received a letter addressed to the defendant from the Illinois Department of Healthcare and Family Services. She testified that she found the letter on the floor of the building's mail room, and when she saw it, picked it up and brought it into her apartment. Robinson put the letter on the table in the living room because she knew that the defendant would be coming to her apartment to drop off her children that day. When the defendant arrived, Robinson asked him "why she would get that letter," and he responded that he "did not know." Robinson denied that the police found the letter in her bedroom, stating that the African American police officer had taken it off the table in the living room, and inquired why

5

the defendant would be receiving mail at her apartment if he did not live there.  Robinson further averred that after the defendant's arrest, a number of letters came to her apartment addressed to him from lawyers.

¶ 18    In rebuttal, the State presented a stipulation that Robinson had been previously convicted of Class 3 child endangerment under case number 14 CR 111201, for causing a child to be in danger that resulted in death.

¶ 19    After hearing closing arguments, the trial court found the defendant guilty.

¶ 20                    B. *Krankel* Proceedings

¶ 21    At the following posttrial hearing, the defendant stated that he intended to hire a private attorney to handle his motion for new trial. The court allowed the defendant several continuances to secure another lawyer, but the defendant was unable to obtain money to hire one.  After the defendant indicated that he wanted to proceed *pro se* and confirmed that he was seeking a *Krankel* hearing, the trial court explained to him that there was "a pre-*Krankel* before that" and asked him if he had anything in writing that he wanted to submit to the court about why his trial counsel was ineffective.  The defendant stated that he did not have anything in writing but wished to proceed orally.  He then made the following ten claims.

¶ 22    First, the defendant asserted that he asked trial counsel to request a "*Franks* hearing" in order to suppress the search warrant on the basis that only a nickname was used as the source in the warrant's affidavit, but trial counsel informed him that "no judge hears them" and that she would not "put that in."  Counsel also told the defendant that it would not be possible to suppress the warrant because the police had a "good ID."  Second, the defendant alleged that he asked trial counsel to move to suppress the two unrecorded statements attributed to him by the police, but counsel refused because she "did not want to draw attention to them."  Third, the defendant

6

claimed that he requested a jury trial but that counsel "said she would not do a jury trial because juries do not know the law" and the defendant had been assigned a good trial judge. Fourth, the defendant asked counsel to argue the "no-knock rule" – *i.e.*, that the officers did not knock when executing the search warrant, but counsel told him "not to worry about that." Fifth, the defendant asserted that he informed counsel about a potential witness, namely his child's mother, whom he claimed "would have known" about the letter sent by the Illinois Department of Healthcare and Family Services to Robinson's address. According to the defendant, counsel told him that she would send an investigator to talk to this witness, but the witness later informed him that no one reached out to her. Sixth, the defendant asserted that he asked counsel why the handgun was never fingerprinted or checked to determine whether it was in operable condition. Seventh, the defendant asked counsel to address the fact that, contrary to their testimony, the police officers entered the apartment through the back door, but counsel told him that because the apartment was so small "this was not an important detail." Eight, the defendant alleged that contrary to his instructions counsel failed to raise the absence of a "*Miranda* waiver sheet" at trial. Ninth, with respect to Robinson, the defendant asserted that against his wishes counsel did not question Robinson about the threats made to her by the police, namely that if she testified in his favor at trial, they would charge her with gun possession. Tenth, the defendant alleged that he asked counsel if he could demand a trial, but she said "no" because she wanted to make sure one of the witnesses was present. The defendant concluded by asserting that his trial counsel did not put up "a good fight," and in fact, put up no fight at all. He also asserted that he was able to see counsel only a certain number of times, and was therefore deprived of a sufficient opportunity to discuss his case with her.

¶ 23     After the defendant stated his claims, the trial court reiterated that this was a "pre-*Krankel*

hearing." The trial court then gave trial counsel an opportunity to respond to the defendant's complaints. Trial counsel stated that she researched the viability of motions to suppress the warrant, and specifically the viability of a *Franks* hearing based on a nickname used for the source, but concluded that such a defect was not sufficient to warrant a hearing. Counsel further explained that she did not believe that there was a basis for otherwise suppressing the search and the resulting evidence. Counsel averred that she never addressed the no-knock rule issue with the defendant. Counsel also stated that she sent an investigator to find the potential witness that the defendant had mentioned to her and that the investigator left information with that witness, but never heard back from her. As counsel explained, "[w]e can't make witnesses talk to us." Moreover, counsel pointed out that they "did find one of the witnesses" that the defendant had mentioned," and that they had "brought her in," namely Robinson. According to trial counsel, because Robinson testified credibly and positively, she "did not see any reason to bring up threatening by officers," which she could not prove up. With respect to the *Miranda* issue, counsel stated that she did not recall discussing the matter with the defendant beyond a passing mention during discovery, since no motion to suppress statements was filed. She stated that she did visit the defendant "a number of times" and went through "everything" with him.

¶ 24    Trial counsel next stated that she wanted to speak most strongly to the idea that she had told the defendant that he "couldn't have a jury trial." She clarified that she had recommended that the defendant pursue a bench trial, but that she told him multiple times that it was ultimately his choice what type of trial to have. She specifically recalled bringing this issue up "again before [the defendant] signed the jury waiver" immediately before the beginning of the bench trial.

¶ 25    After hearing from defense counsel, the trial court found that a *Krankel* hearing was not

warranted. In doing so, the court first stated that counsel was appointed to represent the defendant early on in the case, and that the case was set for a bench trial from the start, but was then continued by agreement at least twice because Robinson failed to appear to testify on the defendant's behalf. With respect to the desired *Franks* motion, or other motions to suppress, the trial court noted that counsel met with the defendant to ascertain his theories, then researched those theories, but ultimately concluded that filing the motions would be frivolous. The court recalled that the testimony established that the defendant was advised of his *Miranda* rights and that he waived them before making any inculpatory statements to the police, so as to support trial counsel's conclusions. As to the defense witnesses, the trial court noted that counsel did use an investigator to track down and secure the testimony of Robinson, who stated that she was a "family friend." Turning to the jury trial issue, the court noted that it admonished the defendant thoroughly regarding his right to a jury trial and that he freely waived that right before the court. As the trial judge explained:

> "The defendant was asked if he knew what a jury trial was; he indicated that he did know what a jury trial was. And he waived it. And I asked him if he had signed the jury waiver after reading it and it was, in fact, his signature. And he identified it as his signature. And then we proceeded to a bench trial. So even if the defendant is to be believed about that, he had an opportunity at that moment to tell the court he wanted to have a jury trial. He did not. He said that he wanted to go forward with the bench trial."

Accordingly, the court found that none of the defendant's *pro se* complaints against his trial counsel rose to the level of possible neglect, so as to require a full-blown *Krankel* hearing with newly appointed counsel.

¶ 26                                                    C. Sentencing

¶ 27        After the termination of the *Krankel* inquiry, trial counsel continued to represent the defendant on his motion for a new trial. After that motion was denied, the parties subsequently proceeded with sentencing. Upon agreement of the parties, the trial court first noted that the presentence investigation report (PSI) incorrectly noted two entries for the defendant's single conviction for possession of a firearm in 1998 and corrected that error. The trial court then heard arguments in aggravation and mitigation from the parties.

¶ 28        In aggravation, the State highlighted the defendant's "extensive and serious" criminal history. The State noted that the defendant's adult criminal history began with a 1998 Class 4, gun possession charge, for which he was sentenced only to probation. According to the State, however, the defendant did not satisfy his probation and instead, was subsequently charged in 1999 with a Class 4 drug offense. Once again, the defendant "received the benefit of probation," but failed to complete it satisfactorily. As a result, the defendant was sentenced to the minimum prison sentence of 3 years in the Illinois Department of Corrections (IDOC). The State further argued that while he was on parole in 2001 the defendant was charged with aggravated vehicular hijacking, which was a Class X offense, for which he received a 22-year IDOC sentence. The State pointed out that this case was a handgun possession case as was the one he had in 2015. Accordingly, the State argued that the defendant had committed similar crimes in the past, which had only become more serious and violent with time. Therefore, the State requested a sentence "beyond the minimum" of 6 years.

¶ 29        In mitigation, defense counsel stressed that the defendant was the father of a four-year-old, for whom he had been providing childcare prior to his arrest, and that he had helped remodel the home he shared with his fiancé. Defense counsel also emphasized that the defendant had been taking ministry classes while in prison and that he had earned two certificates. Counsel further

pointed out that the case was one of constructive possession and that it involved "no violence against any particular person." Accordingly, counsel asked for the minimum sentence of 6 years.

¶ 30   In allocution, the defendant explained that his prior offenses were committed when he was a much younger man and that he has learned since those crimes. He stated that he has helped with cleaning up human waste for "special inmates" while in jail, and that he has taken several classes. The defendant reiterated that this case was about constructive possession, and not one involving violence. He stated that he wanted the minimum sentence so that he could "get home to [his] family and start over."

¶ 31   The court sentenced the defendant to 10 years' imprisonment. In doing so, the court stated that it had considered "the statutory factors in aggravation and mitigation" applicable to this case, the PSI (with the correction), the attorney's arguments, and the defendant's statement in allocution. The court noted that this was a Class X offense with a sentencing range between 6- to 30-years, and the possibility of a 30- to 60-year extended term, followed by 3 years of mandatory supervised release.

¶ 32   The court stated that it did not believe that the case warranted either the minimum or the maximum possible sentence. The court explained that it found compelling that the defendant was a young man, with a family, for whom "[b]y all accounts" he cared, and that he as was "trying to turn things around." As the court stated, "I know you are not the same man that you were at 19 years old as you are today standing before me at 38 years old. You can't be. I appreciate that and I appreciate that you have taken some steps while you have been in custody." In addition, the court agreed that the crime was not a violent one, noting that "[i]t wasn't as if [the defendant] were out on the streets of Chicago with a gun pointing it at somebody." Nonetheless, the court found that the crime had been a "serious" one, and that the defendant did

11

possess a loaded handgun inside a house where children were present.  As the court stated: "This is a house where there were other people *** children in this house."  The court further found relevant that the defendant had "an extensive background and a serious one, albeit starting from a young age."  Under these circumstances, the court found that a 10-year sentence was the most appropriate.

¶ 33     The defendant filed a motion to reconsider his sentence arguing, *inter alia*, that the sentence was excessive and that the trial court had improperly considered in aggravation factors that were "implicit in the offense."  The trial court denied the defendant's motion.  The defendant now appeals.

¶ 34                              II.  ANALYSIS

¶ 35                    A. Improper Double Enhancement in Sentencing

¶ 36     On appeal, the defendant first contends that in imposing his 10-year prison sentence, the trial court erroneously considered as aggravating factors the same two prior convictions that formed the basis of his AHC conviction. The State, on the other hand, argues that in imposing a sentence only 4 years above the minimum required for this Class X offense, the trial court did not engage in an improper "double enhancement," but rather properly exercised its discretion and took into account the seriousness of the defendant's entire prior criminal background in the context of the seriousness of his present offense.  For the reasons that follow, we agree with the State.

¶ 37     It is axiomatic that a reviewing court must give substantial deference to the trial court's sentencing decision. *People v. Brown*, 2018 IL App (1st) 160924, ¶ 9; see also *People v. La Pointe*, 88 Ill. 2d 482, 292 (1981).  This is so, because the trial court, having observed the defendant, and the proceedings is in a far better position to consider the relevant sentencing factors than the reviewing court, which only has the "cold record" before it.  *Id*.; see also *People*

12

*v. Fern*, 189 Ill. 2d 48, 53 (1999). In determining an appropriate sentence, the trial court must consider all of the relevant factors in aggravation and mitigation, including, *inter alia*, the "nature and circumstances of the crime, the defendant's conduct in [the] commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education" (*People v. Maldonado*, 240 Ill. App. 3d 470, 485–86 (1992)) and "balance them against each other" (*People v. Mays*, 230 Ill. App. 3d 748, 758 (1992)). Generally, there is a presumption that the trial court considered all the relevant sentencing factors, and the court need not provide a detailed rationale for its sentencing decision. *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007). A sentence imposed within the statutory range, will be presumed proper, and may not be reversed for an abuse of discretion unless it is manifestly disproportionate to the nature of the offense or greatly at variance with the spirit and purpose of the law. *Brown*, 2018 IL App (1st) 160924, ¶ 9; see also *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16 (citing *People v. Butler*, 2013 IL App (1st) 120923, ¶¶ 30-31)).

¶ 38        In imposing a sentence within the statutory range, however, a trial court may not consider a factor implicit in the offense itself as an aggravating factor during sentencing for that offense. *People v. Ferguson*, 132 Ill. 2d 86, 96 (1989); see also *People v. Singuenza–Brito*, 235 Ill. 2d 213, 232 (2009) ("[T]he double enhancement rule prohibits a single factor from being used twice with respect to the same offense," and occurs, *inter alia*, when a single factor is both an element of the offense and used as a basis for imposing a harsher sentence). The prohibition against double enhancement is based upon the assumption that the legislature considered the factors inherent in the offense when designating the appropriate range of punishment for that offense. *People v. Rissley*, 165 Ill. 2d 364, 390 (1995). We review *de novo* the legal question of whether a

trial court relied on an improper factor during sentencing. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. The defendant bears the burden of establishing that his sentence was based upon improper factors. *Id*.

¶ 39    For the reasons that follow, we find that in the present case, the trial court did not improperly engage in a double enhancement.  In *People v. Thomas*, 171 Ill. 2d 207, our supreme court held that the trial court's use of prior convictions to impose a Class X sentence did not preclude the trial court from considering the same prior convictions a second time as an aggravating factor in sentencing. *Thomas*, 171 Ill. 2d at 229. As our supreme court explained:

"Although the legislature considered the prior convictions of certain defendants in establishing their identity for Class X sentencing, the legislature did not intend to impede a sentencing court's discretion in fashioning an appropriate sentence, within the Class X range, by precluding consideration of their criminal history as an aggravating factor. Rather, while the fact of a defendant's prior convictions determines his eligibility for a Class X sentence, it is the nature and circumstances of these prior convictions which, along with other factors in aggravation and mitigation, determine the exact length of that sentence." *Id*. at 227–28.

¶ 40    *Thomas* concluded that the trial court's consideration of an aggravating factor within the applicable sentencing range "does not constitute an enhancement, because the discretionary act of a sentencing court in fashioning a particular sentence * * * within the available parameters, is a requisite part of every individualized sentencing determination."  *Id*. at 224.  Therefore, "the judicial exercise of this discretion * * * is not properly understood as an 'enhancement.' "*Id*. at 224–25.

¶ 41    Applying *Thomas* to the facts of this case, we find that the trial court properly considered the

defendant's prior convictions for delivery of a controlled substance and aggravated vehicular hijacking, which were used as predicate offenses for his AHC conviction, as part of his criminal history. *Id*. at 227-28. To paraphrase *Thomas*, "while the *fact* of [the defendant's] prior *** conviction[s] determined his eligibility for an AHC charge, it is the *nature and circumstances* of th[ose] conviction[s], which along with other factors in aggravation and mitigation, determined the exact length of his sentence." *Id*. Therefore, in order to properly consider the defendant's criminal history, under *Thomas*, the trial court had to consider these two prior convictions. Moreover, a trial court is not required to refrain from any mention of the factors that are elements of an offense and a mere reference to these factors is not reversible error. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 50

¶ 42 The defendant acknowledges *Thomas*, but argues that the trial court engaged in an improper "double enhancement" because it never considered the nature and circumstances of his prior convictions for delivery of a controlled substance and aggravated vehicular hijacking, but merely considered the fact of their existence as an aggravating factor. The defendant's argument is misguided.

¶ 43 The trial court properly considered the defendant's entire criminal history among the factors at sentencing. The court did not focus on the defendant's two predicate convictions, and did not explicitly refer to them as aggravating factors. Rather, it examined them in the context of the defendant's ongoing recidivism. Specifically, in remarking that the defendant's case was not one that merited a minimum sentence, the trial court noted that the defendant had an "extensive background," which it characterized as "serious." While the defendant correctly points out that the trial court did not delve into the details of this background, it had just heard the State's argument in aggravation highlighting the nature and circumstances of that background, which

15

included multiple unsatisfactory parole terminations dating back to the defendant's first adult conviction in 1998. The State specifically argued that the defendant had been given opportunities early on when he received probationary sentences, but that they were terminated unsatisfactorily, and that his prior crimes had involved gun possession and had become more violent as time progressed. This information was also included in the PSI, which the trial court explicitly referenced in sentencing. That PSI unequivocally established that in addition to the two predicate offenses, the defendant had two other adult convictions (for unlawful possession of a firearm and criminal trespass to land) and one separate juvenile disposition (for robbery and aggravated battery). Under this record, we must presume that by referencing the seriousness of the defendant's criminal background, the trial court was not solely relying on the defendant's two prior predicate AHC convictions, but rather on all of his convictions, his recidivist tendencies and his unsatisfactory terminations. See *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 20 ("It is also appropriate to impose a longer sentence when the defendant has other convictions in addition to those that established his Class X eligibility.").

¶ 44     Lastly, contrary to the defendant's assertion, his criminal history was not the only potential aggravating factor. In fact, in sentencing the defendant, the trial court explicitly stated that it found most relevant the circumstances of the present offense, namely that there were children present inside the apartment where the loaded handgun was found. *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 55 ("In devising an appropriate sentence, the court considers the particular circumstances and facts that speak to the seriousness of the offense."). Accordingly, under this record we find that the defendant's sentence did not constitute an improper double enhancement.

¶ 45                                B.  *Krankel* Inquiry

¶ 46     The defendant next contends that he is entitled to a remand for a new *Krankel* inquiry because the trial court did not address two of his *pro se* claims alleging ineffective assistance of trial counsel.  For the reasons that follow, we disagree.

¶ 47     It is axiomatic that *pro se* posttrial claims alleging ineffective assistance of counsel are governed by the common-law procedure that has developed from our supreme court's decades-old decision in *Krankel*, 102 Ill. 2d 181.  *People v. Jackson*, 2020 IL 124112, ¶ 95.  This procedure " 'serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims' " and to promote the consideration of such claims in the trial court so as " 'to limit issues on appeal.' "  *Id*. (quoting *People v. Patrick*, 2011 IL 111666, ¶¶ 39, 41).

¶ 48     *Krankel* is triggered whenever a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel.  *People v. Jolly*, 2014 IL 117142, ¶ 29.  The defendant is not required to file a written motion in the trial court but may raise the issue orally or through a letter or note to the court. *People v. Ayres*, 2017 IL 120071, ¶ 11.

¶ 49     Nonetheless, new counsel is not automatically appointed in every case. *Jackson*, 2020 IL 124112, ¶ 97.  Rather, upon the raising of such a claim, the trial court must employ a two-step procedure.  *Id*.  First, the court conducts a preliminary examination of the factual basis underlying the defendant's claim—the so-called *Krankel* inquiry.  *Id.*  During this preliminary evaluation, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." (Internal quotation marks omitted).  *Ayres*, 2017 IL 120071, ¶ 12. During the inquiry, the trial court is permitted to question defense counsel about the facts and circumstances surrounding the

defendant's allegations, engage in a discussion with the defendant, or rely on its own knowledge of counsel's performance at trial and the insufficiency of the defendant's allegations. *Ayres*, 2017 IL 120071, ¶ 12 (citing *Jolly*, 2014 IL 117142, ¶ 30; *People v. Moore*, 207 Ill. 2d 68, 78–79 (2003)).

¶ 50       If, during this preliminary inquiry, the trial court determines that the defendant's claim lacks merit or pertains only to matters of trial strategy, the court need not appoint new counsel and may deny the *pro se* motion. *Ayres*, 2017 IL 120071, ¶ 11; *Jolly*, 2014 IL 117142, ¶ 29; see also *Moore*, 207 Ill. 2d at 77–78. A claim lacks merit if it is conclusory, misleading, or legally immaterial, or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel. *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 71 (quoting *People v. Burks*, 343 Ill. App. 3d 765, 774 (2003). If, however, the court finds that the allegations show "possible neglect of the case," new counsel must be appointed to represent the defendant at the next stage of the proceeding—*i.e.,* the hearing on the defendant's *pro se* claim of ineffective assistance of counsel. *Ayres*, 2017 IL 120071, ¶ 11. The appointed counsel can then independently evaluate the defendant's ineffectiveness claim and avoid any conflict of interest that might arise were trial counsel forced to justify his or her actions contrary to the defendant's position. *Jackson*, 2020 IL 124112, ¶ 97.

¶ 51       The applicable standard of review depends on whether the trial court determined the merits of the defendant's *pro se* posttrial claim of ineffective assistance of counsel. *Jackson*, 2020 IL 124112, ¶ 98. The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance. *Id*. Accordingly, if the reviewing court is asked to determine whether the trial court properly conducted a *Krankel* inquiry, the standard of review is *de novo*, *i.e*., we perform the same

analysis that a trial judge would perform. *Id*.; see also *Khan v. BDO Seidman, LLP,* 408 Ill. App. 3d 564, 578 (2011). If, on the other hand, as in the instant case, after performing the *Krankel* inquiry the trial court reaches a determination as to the merits of the defendant's ineffective assistance of counsel claim, the reviewing court may reverse only if the trial court's action was manifestly erroneous, *i.e.* it was clearly evident, plain and indisputable. *Id.* Moreover, even if the reviewing court finds error, it will not reverse if the error was harmless, and the record is sufficient to permit a harmless error analysis of the trial court's ruling. *Id.*; see also *Moore*, 207 Ill. 2d at 80-81.

¶ 52　　In the present case, on appeal, the defendant contends that the trial court did not conduct an adequate *Krankel* inquiry because it failed to take into account two of his ten discrete ineffective assistance of counsel claims, namely, that counsel failed: (1) to contact a potential witness, *i.e.*, the mother of his child; and (2) to subject the recovered firearm to testing to determine whether it was actually operable or bore latent fingerprints suitable for comparison. In this respect, the defendant argues that a *Krankel* inquiry is inadequate whenever the trial court addresses some, but not all, of the defendant's ineffectiveness claims. In support, he cites to the decisions in *People v. Reveles-Cordova*, 2019 IL App (3d) 160418, *People v. Horman*, 2018 IL App (3d) 160423, and *People v. McLaurin*, 2012 IL App (1st) 102943. For the reasons that follow, we disagree and find those cases inapposite.

¶ 53　　At the outset, we reiterate that the purpose of a *Krankel* inquiry is to create a record and potentially limit issues on appeal, and the trial court's goal in reaching this purpose is to ascertain the underlying factual basis of the defendant's claims of ineffective assistance and give him the chance to explain and support those claims. See *Ayres*, 2017 IL 120071, ¶¶ 13, 24. The method a trial court may employ to achieve this goal is a flexible one. See *People v. Jackson*, 2018 IL

App (5th) 150274, ¶ 84, quoting *People v. Fields*, 2013 IL App (2d) 120945, ¶ 4 ("the procedure to be followed at a preliminary *Krankel* inquiry 'is somewhat flexible.' "). Indeed, our courts have repeatedly observed that at this stage of the *Krankel* proceedings the trial court may base its decision on: (1) trial counsel's answers and explanations; (2) a "brief discussion between the trial court and the defendant" or (3) the trial court's own "knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78–7. Therefore, contrary to the defendant's position, there is no requirement that the trial court must orally review every single claim contained in the defendant's *pro se* motion, line by line, and memorialize this for the record. See *Ayres*, 2017 IL 120071, ¶¶ 13, 24. Rather, the trial court must simply "afford" the defendant an opportunity to explain and support his claims of ineffective assistance. See *Ayres*, 2017 IL 120071, ¶¶ 13, 24. While some may consider the address of each claim individually to be a better practice than denying all claims outright after an inquiry, *Krankel* and its progeny do not mandate this—only that the proper inquiry take place. See *Patrick*, 2011 IL 111666, ¶ 41.

¶ 54        With these principles in mind, after a review of the record, we find that the trial court conducted more than an adequate *Krankel* inquiry. After hearing the defendant's allegations, the trial court asked counsel to respond to them. Defense counsel thoroughly explained her reasons in not pursing nine of the defendant's ten claims, focusing primarily on the one she considered to be the most serious charge, namely that despite of the defendant's requests she refused to pursue a jury trial. The trial court ultimately found that all of the defendant's allegations of ineffective assistance pertained to matters of trial strategy, so as not to require appointment of counsel and a full-blown *Krankel* hearing.

¶ 55        Contrary to the defendant's assertion, during the *Krankel* inquiry, defense counsel expressly

addressed her alleged failure to call the defendant's child's mother as a witness. Specifically, defense counsel clarified that her investigator attempted to locate this witness but that he never heard back from her. This same investigator was successful, however, in locating Robinson, whom defense counsel believed to be a positive and credible witness. Defense counsel further explained that she could not make witnesses speak to the investigator if they did not wish to do so.

¶ 56    The defendant is correct that counsel did not respond to his contention that she did not test the recovered handgun for fingerprints and operability. Nonetheless, after hearing from defense counsel, the court found that the entirety of the defendant's ineffectiveness claim pertained to matters of trial strategy. In coming to this conclusion, the court explicitly stated that it had considered not only the defendant's claims in light of counsel's explanations, but also its own review of its notes from the bench trial. Where the State's case rested on proof of constructive possession, the trial court properly concluded that the handgun's operability and the lack of the defendant's fingerprints on the weapon were legally immaterial to the case. See 720 ILCS 5/24-1.7(a) (West 2016) ("A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers *any* firearm." (emphasis added)); *People v. Williams*, 394 Ill. App. 3d 286, 289-90 (2009) (finding that the operability of the weapon was irrelevant to a UUW charge because "[t]here is nothing in the plain language of either statute that requires the firearm to be currently operational or functional to serve as the basis for a conviction[.]"); *People v. Ingram*, 389 Ill. App. 3d 897, 899-901 (2d Dist. 2009) (upholding finding that the defendant constructively possessed weapon despite a lack of useful fingerprints recovered from the weapon when it was tested); see also *People v. Roddis*, 2018 IL App (4th) 170605, ¶ 73 ("If a claim that is taken as true, either on its face or after inquiry, would still not support a finding of ineffective

assistance, then it is legally immaterial."). Under this record, we find that the trial court's inquiry was more than adequate. *People v. Lewis*, 2015 IL App (1st) 122411, ¶¶ 46-49, 85-92 (inquiry was held to be adequate when defense counsel responded to the defendant's claims generally as matters of trial strategy without further questioning by the trial court).

¶ 57    In coming to this conclusion, we have considered the decisions cited to by the defendant and find them inapposite. *Reveles-Cordova*, 2019 IL App (3d) 160418 and *Horman*, 2018 IL App (3d) 160423 both involved defendants raising additional claims of ineffective assistance of counsel after the completion of the preliminary *Krankel* inquiry, and the trial courts' refusals to consider those subsequently raised *pro se* claims. Unlike in the present case, in both *Reveles-Cordova* and *Horman*, the trial courts failed to conduct any inquiry whatsoever into the additional *pro se* claims that the defendants raised after the initial hearing. Conversely, in the present case, all of defendant's *pro se* claims were heard and disposed of at one single *Krankel* inquiry and the defendant did not raise any subsequent claims. The fact that the trial court here did not memorialize its reasoning as to one, legally immaterial allegation on the record, does not mean that the trial court did not consider that claim and is not analogous to an outright refusal to conduct any inquiry whatsoever into a new *pro se* claim. Accordingly, we find those two cases inapposite.

¶ 58    *McLaurin*, 2012 IL App (1st) 102943 is similarly distinguishable. Contrary to the defendant's position, *McLaurin* nowhere holds that a trial court is required to address each and every one of the defendant's ineffectiveness claims for the record during a *Krankel* inquiry. Rather, in that case the court held that under the very specific circumstances of that case, where it was obvious that the trial court's inquiry was woefully incomplete, remand "for the limited purpose of allowing the trial court to make a more complete inquiry" was necessary. *Id*. ¶ 53.

¶ 59    In *McLaurin*, the State and the defense were both interested in the testimony of a potential defense witness who would have disputed that either the defendant or the State's principal eyewitness had been at the scene of a gang shooting, which led to the defendant's charge for first-degree murder. *McLaurin*, 2012 IL App (1st) 102943, ¶ 6. Prior to trial, the defendant's private trial counsel sought an extension because he could not locate this witness, and counsel admitted that he had "no excuse other than [his] schedule and workload." *Id*. The trial court granted the continuance, stating that the defendant "deserved to have a lawyer who would investigate his case" and that "counsel's efforts to locate *** [this witness] up to that time were not due diligence." *Id*. The witness, however, ultimately never testified at the trial and the trial court declared a mistrial after the jury could not reach a verdict. *Id*. ¶ 7. At the defendant's second trial, the witness again did not testify even though the trial court notified the venire that he "was a potential witness in the case." *Id*. ¶ 8. Neither party, nor the trial court, discussed the witness' whereabouts or any efforts to locate him. After the jury found the defendant guilty of first-degree murder, the defendant raised a *pro se* claim of ineffective assistance based on counsel's failure to secure the witness' testimony at retrial. See *Id*. ¶¶ 33-34. The defendant specifically noted the trial court's comments about the witness prior to the first trial. *Id*. ¶ 34. During the inquiry hearing, defense counsel stated that he spoke to the witness, who was out of state, prior to the first trial and said he would come to court but did not appear. *Id*. The trial court, without ever discussing with the defendant or defense counsel any efforts made to secure the witness for the second trial, ruled that this did not amount to ineffectiveness because the witness was out of state and could not be subpoenaed by defense counsel. *Id*.

¶ 60    On appeal, the *McLaurin* court remanded for a new inquiry, finding that the trial court had

not conducted a proper preliminary *Krankel* inquiry. *Id*. ¶¶ 39-55. In addition to finding that the trial court had ignored the Illinois Witness Attendance Act (725 ILCS 220/3 (West 2008)), which authorizes Illinois courts to issue subpoenas of out-of-state witness, the *McLaurin* court held that the parties and the trial court had known since the first trial that the witness was crucial to the defense. See *Id*. ¶¶ 50-51. *McLaurin* specifically noted that the while the trial court had initially directed defense counsel to conduct an investigation into the witness, after the second trial, it never inquired into that investigation and in fact, never mentioned this witness at all. *Id*. ¶ 52. Because of this, and because there was "not enough in the record" to evaluate the defendant's claim of ineffective assistance, *McLaurin* held that remand "for the limited purpose of allowing the trial court to make a more complete inquiry into" defense counsel's efforts "to investigate" the witness and "secure his testimony for the second trial," was needed. *Id*. ¶ 53.

¶ 61     The present case differs greatly. Unlike in *McLaurin*, where the witness was crucial to the defense, so that a decision not to call him could not simply be strategic, here the defendant stated only that the mother of his child "had knowledge" about the recovered letter. In addition, the trial court in *McLaurin* only discussed counsel's efforts to locate the crucial witness before the first trial and completely ignored what transpired after the mistrial, in spite of its own instructions to counsel to locate the witness. Here, on the other hand, counsel fully explained why she was unable to find the defendant's child's mother, but why she believed that even without her, Robinson, whom she did locate, could and did provide the same testimony at trial (*i.e.*, that the defendant did not live at the address where the handgun was recovered). Based on these explanations by counsel, in the present case, unlike in *McLaurin*, the trial court explicitly found that counsel's decision was based on "trial strategy." Moreover, in the present case, unlike *McLaruin*, the trial court's reason for excusing counsel's failure to investigate the witness was

24

not based on any misapprehension of the law.  Accordingly, for all of these reasons, we find that the trial court's inquiry here was very different than that conducted in *McLaurin*.  The trial court in the instant case was thorough and the inquiry was both adequate and complete.

¶ 62                                     III.  CONCLUSION

¶ 63        For the aforementioned reasons, we affirm the judgement of the circuit court.

¶ 64        Affirmed.