**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190382-U

Order filed February 19, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0382 Circuit No. 15-CF-149 |
| | ) | |
| WILLIAM B. HORMAN, | ) ) | Honorable Howard C. Ryan Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Holdridge and O'Brien concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court conducted an adequate preliminary *Krankel* inquiry, and defendant failed to show possible neglect of the case.

¶ 2    Defendant, William B. Horman, appeals the denial of his posttrial *pro se* claims of ineffective assistance of counsel following a preliminary *Krankel* inquiry. Specifically, defendant argues that the La Salle County circuit court's inquiry was inadequate. We affirm.

¶ 3                                I. BACKGROUND

¶ 4        Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) and concealment of a homicidal death (*id.* § 9-3.4(a)). La Salle County Public Defender Timothy Cappellini and his assistant, Douglas Kramarsic, represented defendant at the trial. The jury found defendant guilty of both first degree murder and concealment of a homicidal death. The court imposed consecutive sentences of 35 years' imprisonment for first degree murder and 5 years' imprisonment for concealment of a homicidal death.

¶ 5        After trial but before sentencing, defendant wrote several letters to the court. The first letter was filed March 11, 2016. In the letter, defendant stated that his public defender purposefully failed to ask questions to unspecified witnesses and that an actual conflict of interest existed. Defendant alleged that his attorneys did not request fingerprints from a bucket or oil containers, and they did not test his hair or nails for mood-altering drugs. He also stated that his counsel provided ineffective assistance by failing to present expert testimony concerning footprints, hair, and DNA evidence discovered at the crime scene. Defendant claimed that his codefendant's first videotaped interview should have been played at trial to show how he was coerced by the police. He also alleged that his attorneys did not want to file a motion for forensic testing.

¶ 6        On March 16, 2016, defendant filed another letter. Defendant stated that his attorneys failed to present expert testimony concerning footprints, hair, and DNA evidence discovered at the crime scene. Defendant alleged that unspecified defense witnesses were not called at trial, his first videotaped interview did not start at the beginning, and a video was not played in front of the jury. He further complained that his attorneys did not have phones, buckets, oil containers, and aluminum foil tested for fingerprints. Defendant alleged that his attorneys never asked critical questions to expert witnesses and State witnesses, giving the following examples: failure to question officers about discarding his coffee cup that his contained is DNA, and failure to fully

interrogate John Jeffries, Sam Dewire, and Ray Blasum. His attorneys also failed to impeach witnesses.

¶ 7        On March 21, 2016, defendant filed two more letters alleging that his attorneys "pretended" to help him but failed to question unspecified people, test for fingerprints, or check his medical history concerning his limited weight restrictions. His lawyers lied to him and treated him like a criminal rather than a client. On March 31, 2016, defendant sent yet another letter complaining of his attorney's shortcomings.

¶ 8        On March 31, 2016, defendant filed a letter stating that there was "a lot of evidence" that his attorneys did not investigate. Defendant also alleged that his attorneys failed to ask questions necessary to "clear" defendant.

¶ 9        After sentencing but before the notice of appeal was filed, defendant filed another letter on May 4, 2016. He stated that his appointed attorneys were not helping him, did not explain things to him, and were very incompetent. His attorneys did not explain his right of allocution to him prior to the sentencing hearing. He told his counsel to ask witnesses, like Dewire, more questions, and counsel told him to be quiet. He also wanted his attorneys to ask questions about coffee and why the beginning of the recorded interview was cut. He wanted counsel to ask Debbie about how he was getting along with the victim in the days leading up to the victim's death. Donnie Thompson should have been called as a witness because "he knew what hidden secrets of Grumpy (Tim Carver) where [*sic*] told by victim several weeks pryor [*sic*] to this heinous crime." Most of the witnesses at trial were not credible. His counsel never filed a motion *in limine* or requested evidentiary hearings. Counsel failed to call favorable witnesses or show videos of his codefendant's police interview that would show coercion. Defendant also alleged that his attorneys sometimes gave the State information to use against defendant.

¶ 10    The circuit court did not address the claims of ineffective assistance of counsel in defendant's letters.

¶ 11    On appeal, we affirmed the judgment of the circuit court but remanded the matter for a preliminary *Krankel* inquiry into the posttrial claims of ineffective assistance of counsel that defendant raised in his letters. *People v. Horman*, 2018 IL App (3d) 160423, ¶ 33.

¶ 12    After our mandate issued, a status hearing was held on June 6, 2019. Defendant asked if he could put some things on the record, and the court allowed him to do so. Defendant discussed an affidavit from Cody Smith, various items and evidence that defendant wanted turned over to him, and several claims of ineffective assistance of trial counsel. Defendant said his counsel was ineffective for failing to: play his codefendant's three videos to show that the codefendant had been coerced, "get blood, hair and nails from all the drugs tested," investigate defendant's alibi, ask Dewire and Jeffries the questions defendant told them to ask, and question witnesses who were favorable to defendant.

¶ 13    On July 3, 2019, the circuit court conducted a preliminary *Krankel* inquiry. The court stated that the letters that were the subject of the inquiry were filed on March 11 and 16, 2016. The court noted that defendant had discussed additional allegations and complaints at the last hearing, and defendant said he had more complaints that day. The court told him to talk about those complaints. The court told defendant to talk about his letters as well.

¶ 14    Defendant stated that he needed certain videos to show his whereabouts on April 15 and 16, 2015, including surveillance footage from a gas station. Defendant talked about a gun that Dewire had sold to the victim. His trial attorneys failed to ask Dewire why the victim would need a gun. Defendant asked what happened to a note from "Grumpy" that was on Jeffries's windshield.

Defendant said that he needed transcripts from the proceedings in the circuit court and the appellate court. He insisted that the trial evidence was insufficient to convict him.

¶ 15    The circuit court noted that the appellate court had ordered it to conduct a preliminary *Krankel* inquiry. The court stated that two letters were sent prior to sentencing. The court said one letter was filed March 11, 2016, and the other was filed March 16, 2016. The court asked defendant's trial attorneys, Cappellini and Kramarsic, if they had gotten a chance to review those two letters. Cappellini said he had reviewed them. Kramarsic said he did not recall the specific dates, but he believed that he reviewed every correspondence.

¶ 16    The court asked Cappellini and Kramarsic to respond to the allegations in defendant's letters. The following exchange occurred:

"MR. CAPPELLINI: I don't quite understand exactly what the complaints are. We preserved all those issues. We looked at and interviewed and talked to people that were possible witnesses. As I said before nothing bore out that would be helpful to us. As far as the motion to suppress we heard that. We preserved that for appeal so all these issues were addressed so I don't understand exactly what the complaint is.

THE COURT: Apparently there seems to be in one of the letters something about a request for fingerprints on bucket or container and tests—

MR. CAPPELLINI: The problem is there wasn't any physical evidence directly connecting our client or anyone else to this crime other than the blood that was found basically at the crime scene.

THE COURT: There's also an allegation failure to present expert testimony concerning footprints, hair and DNA.

MR. CAPPELLINI: There wasn't anything to present.

THE COURT: I'm just reading from the letter.

MR. CAPPELLINI: I understand.

THE COURT: The co-defendant's first video played at trial. He's complaining that apparently it looks to me like he's saying it should have been played, the co-defendant, because this case rose and fell on this person's testimony.

MR. CAPPELLINI: I understand that, but that wouldn't have been proper.

THE COURT: I just need your response to it, counselor. That's fine. Then the March 16th there seems to be once again he talks about foot prints [*sic*], hair, DNA evidence. There were witnesses. Apparently they're alleging some witnesses for the defense were never called at trial.

MR. CAPPELLINI: There weren't any witnesses that would have helped us. We went through this many times.

[DEFENDANT]: Can I say something?

THE COURT: Nope. Let's see. Once again he talks about in that March 16th co-defendant's first video never played in court, coached and coerced him in to speaking. There's an allegation the Public Defender never asked critical or crucial questions of expert witnesses and witnesses for the State. Mr. Cappellini.

MR. CAPPELLINI: We did everything we could. We asked every question that was possible, and we did point out many times to the jury that the co-defendant and what his situation was, what his deal was and even had \*\*\* the instruction given, but there was nothing else that we could have asked that would have mattered.

THE COURT: There seems to be also some complaints about Mr. Jefferies was never asked about some note left by Grumpy or asked about.

MR. CAPPELLINI: That's because our investigation that just didn't pan out to be material.

THE COURT: The last one appears to be my counsel—asked my counsel to discredit or impeach witnesses that they make up lies that are not credible.

MR. CAPPELLINI: We did what we could to impeach every witness.

THE COURT: Mr. Kramarsic, you were present when I asked those questions of Mr. Cappellini. Do you have anything different?

MR. KRAMARSIC: I would agree with everything Mr. Cappellini said without question, and I would also add the fact that this note or whatever it was it didn't pan out. His stories were so—he changed his stories so many times, and there was an issue with a young gentleman from Chicago with bringing [the victim's] vehicle to him which completely contradicted or this note that he's talking about so that's another reason that did not advance our defense whatsoever, judge. The witnesses that we did

speak to again had nothing to add that would have as far as time line or his whereabouts had nothing that would have helped us whatsoever."

¶ 17    The court then permitted defendant to respond. Defendant said that his attorneys were lying. He had someone contact people while he was in jail, and his attorneys never spoke with the witnesses. His attorneys never investigated the case like they were supposed to. The court asked Cappellini about defendant's allegations that he had not spoken to witnesses; Cappellini said that he did not know which witness defendant was referring to or what defendant was talking about.

¶ 18    Defendant stated that his attorneys should have "located the ping locations" on certain phone calls. Defendant then began discussing an affidavit from Smith and said that his counsel did not investigate. In response, Cappellini said that Smith was charged with a sex offense and a murder for hire in the jail. Cappellini did not know what Smith had to do with defendant's case. Defendant said that his codefendant made certain admissions to Smith, and defendant learned about this in prison. The court said that this matter was not what they were in court for that day. The court stated:

> "After doing a preliminary investigation in this particular matter on the second phase I still don't have a color yet. They're somewhat the same as what was raised before, and explanations have been given which were agreed with, not agreed with, but does it rise to the level of ineffective, no, not that I can find with a preliminary look so I'm not going to say it's ineffective. I'm not going to appoint counsel so the previous orders and rulings will all stand."

¶ 19                                    II. ANALYSIS

¶ 20 Defendant argues that the circuit court's preliminary *Krankel* inquiry was inadequate because the court failed to inquire into some of the claims raised in his letters, the court failed to ascertain the factual basis for some of the claims it did inquire into, and the court appeared to apply the incorrect standard. We find that the court conducted an adequate inquiry and that defendant failed to show possible neglect of the case.

¶ 21 Under the common law procedure developed from *People v. Krankel*, 102 Ill. 2d 181 (1984) and its progeny, when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel, the circuit court is to examine the factual basis of the claim. *People v. Jolly*, 2014 IL 117142, ¶ 29. If the circuit court determines that a defendant's *pro se* claim lacks merit or only pertains to matters of trial strategy, the court may deny the *pro se* motion without appointing counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11. However, if the defendant's allegations show possible neglect of the case, the circuit court should appoint new counsel to represent the defendant in advancing his or her claims. *Id.*

¶ 22 During a preliminary *Krankel* inquiry, " '[t]he law requires the trial court to conduct some type of inquiry into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of counsel.' " *Id.* (quoting *People v. Moore*, 207 Ill. 2d 68, 79 (2003)). The circuit court must conduct an " 'inquiry sufficient to determine the factual basis of the claim.' " *Id.* (quoting *People v. Banks*, 237 Ill. 2d 154, 213 (2010)). "The purpose of the preliminary inquiry is to ascertain the underlying factual basis for the ineffective assistance claim and to afford a defendant an opportunity to explain and support his claim." *Id.* ¶ 24.

¶ 23 "During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a

defendant's claim." *Moore*, 207 Ill. 2d at 78. "[T]he trial court may inquire with trial counsel about the facts and circumstances surrounding the defendant's allegations. [Citation.] The court may also briefly discuss the allegations with defendant." *Jolly*, 2014 IL 117142, ¶ 30. The court is also permitted to base its evaluation the defendant's claims on its knowledge of counsel's performance during trial. *Id.* "The issue of whether the circuit court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo.*" *Id.* ¶ 28.

¶ 24 Here, the circuit court conducted an adequate preliminary *Krankel* inquiry. The court inquired into the factual basis of defendant's claims and afforded defendant ample "opportunity to explain and support his claim[s]." *Ayres*, 2017 IL 120071, ¶ 24. At the outset of the hearing, the court asked defendant to talk about his letters and any other allegations he wanted to bring to the court's attention. The court also went through the claims in two of defendant's letters and asked defendant's attorneys to respond. The court then gave defendant an opportunity to respond to his attorneys' statements. While the court only discussed two of the six letters defendant had filed and failed to ask questions concerning some of the claims raised in the letters, the court gave defendant the opportunity to bring up any additional claims he wanted it to address. Defendant failed to mention the additional letters or discuss many of the claims raised in his letters. While the circuit court was permitted to ask defendant more questions concerning his claims during the preliminary *Krankel* inquiry (see *Jolly*, 2014 IL 117142, ¶ 30), it was not the court's burden to pry the specifics of defendant's claims out of him at the inquiry.

¶ 25 We acknowledge that the circuit court's finding that defendant's allegations did not "rise to the level of ineffective [assistance]" indicated that it may have applied the *Strickland* standard for ineffective assistance claims rather than the less-stringent possible neglect standard, which applies at a preliminary *Krankel* inquiry. See *Ayres*, 2017 IL 120071, ¶ 11. However, we review

the circuit court's judgment, not its reasoning, and we may affirm on any basis supported by the record. *People v. Ringland*, 2015 IL App (3d) 130523, ¶ 33.

¶ 26    Here, the record shows that defendant failed to satisfy even the possible neglect standard. Defendant failed to provide adequate detail, either in his letters or at the preliminary inquiry, regarding which witnesses he believed his counsel should have called, what the testimony of these witnesses would have been, and what additional questions his attorneys should have asked to discredit State witnesses on cross-examination. Also, these were matters of trial strategy, which are generally immune from claims of ineffective assistance. See *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79 ("Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel. [Citations.] It is well established that these types of decisions are considered matters of trial strategy and are generally immune from claims of ineffective assistance of counsel.").

¶ 27    The statements of defendant's trial attorneys at the preliminary *Krankel* inquiry indicated that the actions and omissions challenged by defendant were a result of trial strategy and that defendant's claims lacked merit. Defendant's trial attorneys indicated that they talked to possible witnesses and that their testimony would not have been helpful to defendant's case. In response to defendant's claims that his attorneys failed to have various items tested for fingerprints and failed to present expert testimony concerning fingerprints, hair, or DNA, Cappellini indicated that no such evidence could have been presented. Cappellini stated that it would not have been proper to play the codefendant's videorecorded interview at trial. Cappellini said that they asked the witnesses all the questions they could and did what they could to impeach each State witness. Cappellini said there was nothing else they could have asked that would have mattered. Cappellini

- 11 -

and Kramarsic indicated that they investigated a note from "Grumpy," but it did not pan out to be material.

¶ 28    While defendant correctly notes that some of the claims he raised in his letters were not explicitly addressed at the preliminary *Krankel* inquiry, most of these claims were vague and conclusory. For example, defendant generically claimed that his trial counsel had a conflict of interest, failed to investigate "a lot of evidence," lied to him, failed to question Debbie, failed to question Thompson about unspecified "hidden secrets" of Carver, and failed to advise him in advance of his right to allocution. Defendant had an opportunity to provide more detail concerning these claims at the preliminary inquiry, but he failed to do so. Accordingly, defendant failed to show possible neglect with regard to these claims. See *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 40 ("A claim lacks merit if it is conclusory, misleading, or legally immaterial or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel.").

¶ 29    In his letters, defendant alleged more specifically that his trial attorneys failed to question Dewire about defendant's relationship with the victim, question Jeffries about purchasing the victim's belongings from the scene, and failed to present medical evidence concerning defendant's back problems and lifting restrictions. However, these claims also pertained to matters of trial strategy. See *Wilborn*, 2011 IL App (1st) 092802, ¶ 79. Thus, defendant failed to show possible neglect with regard to these claims. See *Ayres*, 2017 IL 120071, ¶ 11.

¶ 30                                    III. CONCLUSION

¶ 31    For the foregoing reasons, we affirm the judgment of the circuit court of La Salle County.

¶ 32    Affirmed.